141030 Delano Farms Company v. California Table Grape Commission. Mr. Hadley? Yes, Your Honor. Wait a couple minutes, let everybody get organized. Thank you, Your Honor, and good morning. This case turns on a single legal question. Is the public use bar triggered when an inventor or a third party in control of an invention relinquishes control of that invention by giving or selling the invention to another person prior to the critical date? The answer is that it is, and that answer is set forth in the case of Egbert v. Lipman, the Supreme Court Corset-Steele case. That has been long cited for this proposition. No case that I'm aware of has ever held that the public use bar does not apply where a person in control of the invention relinquishes that control by giving the invention to another person. What if the inventor gives another person the invention, but under conditions, under conditions of confidentiality, under conditions of secrecy, and so forth? In that case, Your Honor, the person giving the invention would not have relinquished control. There's a critical difference in the cases between giving in a manner where control is relinquished by either the inventor or the third party that is in control of the invention, versus maintaining control by imposing, as the Supreme Court said in Egbert, some sort of, well, not some sort, but specifically a limitation, restriction, or injunction of secrecy. But what do we do about a category of cases of which this seems to be one in which we have a disloyal employee? And one could argue, I guess, about Mr. Klassen's role and so forth. Let's assume, for purposes of the question at least, that Mr. Klassen clearly disregarded, disobeyed the requirement that he not distribute this to anyone. And he does distribute it to someone, but the person to whom he distributes it maintains it in some degree of confidentiality. Where's the public use in that sort of situation? I think in that situation, it's a closer question. Why is that different from this case? Because in this case, what happened was Mr. Klassen gave the plant material to Jim Lutie. So Jim Lutie became the person in control of the invention. When he gave the grapevines to Jim Lutie, Jim Lutie had complete... Wait, can we step back a minute just applying Judge Bryson's question? The first step I understood was whether or not Mr. Klassen had the authority to do that or whether he was a runaway employee who really didn't have the authority to give that away in the first instance. And that question has been settled by this court several times. It's in our briefs that this court has said that there is no exception in the public use bar statute for a stolen invention. The cases, that line of cases is well settled and it doesn't matter whether the person receiving the invention was innocent or not. The district court found that it didn't matter how Mr. Jim Lutie came in possession of the invention. The point is that once he became, once he had possession of the invention, he was in complete control with what happened with that invention. He could have kept it secret, he could have... So the question for us is whether when he gave it away, he put conditions on it that would make it secret or not. That's correct. Or the way, I think the more accurate way to say it is whether Jim Lutie relinquished control over the invention by imposing those restrictions. Didn't the district court make factual findings that when he gave it away, he told his cousin and the other person to keep it secret? He told them, you know, let's kind of keep this between ourselves. That was the district court's finding. The district court did not find that there was any, in the terms of the Ebert case, a restriction or injunction of secrecy. Well, there wasn't a formal agreement, but you wouldn't expect that. I mean, Mr. Jim Lutie is not going to go to his cousin and say, I have here a secrecy, a confidentiality agreement, please sign it. But isn't it the case that what the district court has found is these people understand that they have this product illegitimately. They can take advantage of the fact that they have it illegitimately and get a jump on the other growers. But in order to continue to benefit from it, they can't spread the news broadly that that's what they have. The undisputed testimony in the record, in fact, Jim Lutie expressly testified that when he gave the vines to Larry Lutie, he lost control. He relinquished control. He relinquished control, but did he relinquish control subject to an understanding that Larry Lutie would not promulgate the material widely? Well, first of all, once he relinquished control under the Egbert case, it didn't matter how widely Larry Lutie promulgated or not the case. If you say I relinquish control to simultaneously say, keep this secret, that's not really relinquishing control, is it? If there is in the terms of Egbert, a injunction of secrecy, whether it's written or or not written, whether it's a verbal agreement or not. Isn't this all whether he relinquished control or he said to keep it private, a factual matter? It is in some sense a factual matter, but the point is that the district court did not make a finding that Jim Lutie retained control of the invention. The district court did not make a finding that there was an injunction of secrecy, whether verbal or written. In paragraph 21 of the district court's decision, Jim Lutie gave a few bugs, blah, blah, blah, to Larry, at which time he told Larry Lutie that they should, quote, keep it to ourselves. Larry Lutie understood that the varieties had come from a USDA facility and had not yet been released. In addition, Jim Lutie expected their possession of the unreleased varieties to remain private. Why doesn't that really answer the question? This is a finding by the district court. Because the district court did not find that that rose to the level of an injunction of secrecy under Egbert, and the testimony, first of all, showed both Jim Lutie and Larry Lutie admitted in trial that they lost control. Jim Lutie admitted that when he gave the vines to Larry Lutie, he didn't tell him, he didn't restrict where he could plant, how much he could plant, who he could tell, where he could do, what he could do with anything. I mean, he said he didn't relinquish who he could tell, but that's not the finding of the district court, where he said, he told them that they should keep it to ourselves, and that he expected them to remain private. Just saying, let's keep it to ourselves, and in fact, I don't think that that rises to the level of a restriction or obligation or an injunction of secrecy under Egbert. And in fact, the most critical... What would he have had to do if he wanted to give these to his cousin and enjoin him from making it public? They would have at least had to have a mutual agreement. Larry Lutie would have said, yes, I will do that. You give this to me on the condition that I will keep it secret. And then you would have expected some evidence that he would have kept it secret. You're expecting great farmers in California to go through the formalities of a contract? It doesn't have to be something secret. I mean, don't you think that if I'm a great farmer, and I go over to my cousin's farm and say, here's some new varieties to try out, but don't tell them to anybody, and the guy takes them, he's going to honor that agreement? I think that, sure. I mean, if it's a condition of obtaining the vines, then yes, absolutely. That would indicate at least some, that would be some objective evidence that the person giving the vines away maintained some control over the invention. The passage in the district court's opinion seems to suggest that they all agreed to keep it secret. Isn't that enough? I don't think that there was a finding of an agreement to keep it secret. And in fact, the first thing that Jim Lutie did... The district court didn't use the word agreement. Yes. Do you think that the district court had to use the word that there was an agreement to keep it secret, rather than they all said they would keep it secret? I think that the district court, if the district court had made a finding of fact that there was an injunction of secrecy within the scope of Litman, that would be one thing. But the district court never made that finding. And in fact, the first thing Larry Lutie did after he reproduced these vines was he went to Richard Sandlin. If we read the district court's language as sufficient to find an agreement of secrecy, is that enough or what's your arguments on clear error on that? My argument on clear error is that there was no secrecy because, among other things, Larry Lutie told Richard Sandlin he didn't keep it secret. He planted these vines in a way that showed that there was no secret. Do you think that, assume there was an agreement between Jim Lutie and Larry Lutie, do you think that Larry Lutie's giving information and ultimately vines to Mr. Sandrini is a public use? I mean, I guess he actually didn't give any of the vines, any of the wood to Mr. Sandrini until after the critical date. But suppose he had, suppose there had been an injunction agreement between Larry and Jim that Larry would not disseminate and he gave some of the wood to Mr. Sandrini, would that be a public use? You know, that relates to a problem of how far do you have to go once you, you know, into the public use. In other words, how far does it have to extend? But the answer to your question is yes. If it was before the critical date, I suppose that if there was a similar agreement between Larry Lutie and Sandrini that Sandrini would keep it secret. But as long as somebody breaks the chain by not abiding by the agreement, notwithstanding that the agreement is ironclad, enforceable, solid in writing, in blood, as long as somebody disobeys the agreement, it's in the public domain. Yes, and Larry Lutie did. Even if there's no way that the inventor could know that that had happened. Yes, because the person in control of the invention has lost control and the person receiving it has violated the injunction of secrecy. That puts it in the public domain. And that's exactly what Larry Lutie did here. Let me see if I understand your position with respect to Jim Lutie. You're not saying that the disclosure to Jim Lutie was enough to put it in the public domain, correct? We don't have to find that in this case to find a public use. I think it's a closer question. But you're not arguing that. I'm not arguing that. And you would distinguish Jim and Larry on the ground that Mr. Klassen gave it to Mr. Jim Lutie under some form of confidentiality agreement. I don't think there was a form of confidentiality agreement. But it was enough to keep it from becoming public. It was enough to transfer control from Klassen to Jim Lutie, where Jim Lutie became the person in control of the invention. He became in control, but he was in control subject to an agreement of confidentiality, if I understand your position. Which he violated by giving it to Larry Lutie. Right. But if we find that the injunction, if it were, from Klassen to Jim Lutie was essentially the same quality as the injunction from Jim to Larry, then we would say that Larry didn't have it in public use, correct? We would say that the chain was broken twice. Well, but you're arguing the chain wasn't broken the first time because, or at least you're conceding as I understand it, that the Klassen's injunction to Jim was sufficient to preserve the confidentiality and keep it from going into the public domain when it went to Jim. When it went to Jim, but then as soon as Jim gave it to Larry, it went in the public domain. Right. And even if you find that there was an injunction of secrecy there, once Larry told Sandrini, then it entered the public domain. So there are three possible places where it entered the public domain. But just telling Sandrini that I've got the stuff wouldn't be putting it in the public domain. He brought Sandrini to his farm and showed him the vines. That was sufficient. Oh, that's sufficient. Yes. I see that I'm well into my rebuttal time. Well, we'll retain what's left and let's hear from the other side. Now you are dividing your time here. Yes. Mr. Sanders. Yeah. The first 12 minutes for the California Table Group Commission with three minutes reserved for the United States. Good morning and may it please the Court. This panel has recognized already there were specific factual findings in this case. The district court carefully sat through three days of testimony, parsed through the record and recognized that here given, especially given the context in which the transfer of material occurred and that everyone knew this was unauthorized USDA material. And given the statements that were made at the time that there was a, quote, environment of confidentiality. On top of that, the district court found that each person in the chain, the Lutis and the Sandrini, maintained tight control over who knew about the unauthorized plant material and who had plant material where the district court found it. What's the evidence that Sandrini agreed to keep them confidential? On the Sandrini piece, I think that that is coming from his actions in the sense that Sandrini gave testimony that, and this is at A, 1689 through 1690, questions, so from the very beginning then you knew that Jim, Jack and Larry Lutis had unreleased plant material that they weren't supposed to have, correct? Answer, yes. And then he's asked at A, 1703, question, and you also wanted to keep the late white vines to yourself and to Larry Lutis when you saw those vines on Larry Lutis' farm in 2002, correct? Answer, yes. So he and his, Sandrini's own words have said right from the very beginning he had an intent to keep this confidential. Well, the district court's findings are a little looser, I think, in that regard. At paragraph 47, the district court kind of characterizes, I guess enough to satisfy him at least, is that Sandrini admitted that he wanted to keep advantage to himself and his friends. So he's relying on the fact that Sandrini saw that there was an advantage to not disclosing this to anyone. Is that sufficient? I mean, just because we conclude that they would have realized they better not make this stuff public because they'll lose the competitive advantage if they do. Yes, I think that is a strong incentive to secrecy. And then when you combine that with Sandrini's own admissions about this being unauthorized plant material and the district court's fact findings regarding what happened. I mean, the district court found that, quote, Sandrini intentionally mislabeled the grapes as Thompson seedless to avoid alerting the commission to Larry Lutis' unauthorized possession of the autumn cane. But that was after the critical day. Sandrini didn't, as I understand it, didn't grow anything, didn't even have possession, physical possession of any of the material until after critical day. Yes, but that's the point, that even after the critical date, you have extraordinary measures being taken to keep this confidential. And so, you know, looking at the, you know, we don't have a transcript of the exact conversations that occurred at the time. But when you look at the actions in this case and the fact that even later you have someone intentionally falsifying reports to conceal these grapes, in Jim Luti's case, you have admitted false testimony under oath to conceal the source of it. Also, with respect to Sandrini, you did have testimony from Jim Luti that when he was learning that Sandrini was being brought within this bubble of confidentiality, he had a conversation with him about confidentiality. This is on A, 1971 through 72. The question was, and we asked you in your 2006 deposition, this question, Jim Luti, did you say anything to Richard Sandrini about keeping it confidential? And your answer was, yeah. And does that, does this remind you that you did tell Mr. Sandrini that you should keep those vines confidential? Answer, yes. I'm sure I told him that we were concerned about it. What I'm a little unclear about is why Sandrini, having, prior to the critical date, all that Sandrini did, as far as I can understand, is to be aware that the Lutis had the grapes and to have gone over and looked at the grapes. Is that public use? Does that put those, that product, that patentable product in the possession of Mr. Sandrini? No, I don't think so. And particularly in the circumstances, in a circumstance in which his intent at the time is to keep this within that tight circle there. Well, even if, even if Mr., suppose Mr. Luti had invited the entire town to come over and look at his grapes, but he said, don't touch, you can't take any of the material, just look at the grapes. Would that put those grapes in the public use? I mean, I think that is a much closer case because you get into the tricky question of the justifiable reliance of the public here and whether that's a circumstance in which the public then comes to believe these are out there in the open, which is very different from this case where you can't, the policy behind the public use bar in terms of protecting that justifiable reliance doesn't come into play at all. Because everyone who's involved knows exactly what this material is and understands that they can come to believe it. But I assume you would argue that just displaying something is not necessarily a public use because weren't these grapes displayed for the trade show? Yes, you're talking about the earlier use by the inventor himself. Yeah, but also, I mean, it's just displaying those grapes at trade show would have been a public use. And we wouldn't be here at all because he clearly did that. Right, that's a theory that was never argued and I think it's also a circumstance in which you don't have the complete invention displayed either. Is that because they just described the actual fruit and not the plant? Yes, exactly. And so under the motionless keyboard case of the circuit where you had the display of the keyboard but it wasn't actually connected to the computer. Let me ask you a very specific factual question, at least for me it's kind of critical, as to exactly what Mr. Klassen said to Mr. Jim Luthe. In your brief you say, well, he told him, I think you say explicitly, specifically instructed him not to let the material get away from him. But as I read the record, Mr. Luthe did not recall Mr. Klassen saying that and seems to testify, he was asked if Klassen told him he should not let the vines get away from him. And he said, I don't remember him saying that, but you know, I think that's what I thought. And that seems to me rather different from saying that Klassen actually said that. And if you look at, this is on 1941 that that testimony appears, and there is at 1144 a reference to Jim Luthe does not remember the exact words he used, but recalls generally that Klassen did not want Jim to let the material to get away from him. Do you think that that evidence is sufficient to support the, and that's in a summary judgment motion. Do you think that the evidence of Luthe's testimony is strong enough to support the district court's findings on that point? Yes, I think it is. And why, because I think you will agree with me, at least from 1940, that's not specifically, evidence of specifically saying that he told, that Klassen told Luthe not to let it get away from him. Yes, and I think this is a perfect instance in which you had periods at trial in some of the testimonies you're specifically citing, where Jim Luthe was at points tending to play down. Right, he certainly was here and there, but is there any place that he actually said that's what Klassen said? I don't know specifically for the statement. What we do know, given the distance of time, is what Jim Luthe took away from the conversation with Klassen. So even if we don't have the exact words, and I just don't have it at my fingertips one way or another, by the scope of that, we know that Jim Luthe came away from that conversation with a clear understanding that he was supposed to be keeping tight control over this. And in your theory of the case, that's what matters, is what was in Jim Luthe's head, not what was in Klassen's head, I take it. In other words, if Klassen didn't care what he did with it, but Luthe said, I've got to keep this secret, that that would be enough to keep the material from becoming in public use? I think that would be enough, but I think that it is also fair to infer from Jim Luthe's understanding that that is coming from the conversation, and quite frankly, we never had an opportunity to depose Mr. Klassen in this case, because Jim Luthe's false testimony under oath, in falsely saying he didn't identify him, deprived us of that opportunity. He waited until after Mr. Klassen had passed away to admit to that. So I think this is important to step back here and review the overall context here. Given the passage of time, we have snippets of the exact words that are going back and forth between them, but that's not what's important here. You see from the context, the way people are acting, the steps that are taken to maintain secrecy here, their own testimony at trial about their understanding, the District Court's factual findings about the incentives of secrecy here, and you have, in the end, very limited knowledge with a shared commitment to keeping confidentiality of plant material that no one outside that understanding of confidentiality could identify the vines, or buds, or cuttings. Why don't we hear from your colleague? Thank you, Your Honor, but I'll be brief. I think that the Court has a pretty good grasp of this case. Certainly, as the District Court properly found, there was no public use. The one reason that's been discussed at length is there was an understanding, and I don't think there's a formal requirement that there has to be this formal chain like a chain of title. These folks knew they should not have the material. They didn't want this to be public. The other reason is, of course, confidentiality is one way in which a use is not going to be a public use. The other way is if it does not inform the public. If the public can't gain possession. Certainly, the District Court was within its rights to credit testimony of Dr. Ramming that you could not identify varieties from foliage, and given the state of these plants at that time, just casually viewing it by Mr. Sandrini wasn't going to put the invention within the possession of the public. Whether or not you'd have to actually transfer the sticks is a wonderful question, given the character of the plant patent, because the invention is the propagatable material. But at any event, I think that the District Court certainly could credit testimony, which it did. There was testimony going all over the place, quite honestly, with Jim Looney, times in which he did indicate there was this understanding of confidentiality, and the District Court could properly weigh that. Given that, this Court should confirm the judgment to all. How much time do I have remaining? Just under two minutes. I'll be brief. I want to go back to paragraph 21 of the District Court's decision. The Court found that Jim Looney told Larry Looney that they should keep it to ourselves. I don't think when you look at Egbert that that rises to the level of an injunction of secrecy. The Supreme Court in Egbert chose its words very carefully. It imposed a very high standard for what it takes to keep possession when an invention is given to another person. It's different than when an invention is just showed to another person. Their somewhat looser standard may apply. Maybe if you just show it, saying, let's keep this to ourselves, may be enough. But when you actually hand over the invention such that a third party can take it and make the invention, the Supreme Court in Egbert very carefully imposed a very high standard of an injunction of secrecy. I don't recall, Egbert, that there was any obligation or injunction of secrecy toward the young lady at all, was there? There wasn't, but the Supreme Court still held and set forth the rule of law that when you give an invention, if you don't want the public use bar to apply, you have to do something very specific. You have to keep control by imposing a restriction, a limitation, or as the Supreme Court said, an injunction of secrecy. Simply saying, we should keep this to ourselves, I don't believe rises to that level. I do think that it very well may, and there's plenty of cases to support that it might, including the Day case here, where the invention is showed to somebody else or it's provided under the situation where very clearly the person in control of the inventor keeps the control, such as in a clinical trial situation. But if you give an invention to somebody, as opposed to just showing it like in the Rubik's Cube case, then, exactly, in that case and in the case involving showing the furniture, say, look, we're all in the room, let's keep this quiet, that's fine, but when you actually hand over the invention, if you gave the Rubik's, go reverse engineer it, go do whatever you want, it's yours to do, then, if you don't want to put that invention in the public use, whether you're the inventor or the person in control, you need something that will rise to what the Supreme Court said has to be an injunction of secrecy. And just saying, let's keep it to ourselves, or we should keep it to ourselves, doesn't do it. And Larry Ludy, plainly, didn't keep it to himself. Wouldn't Moleculon essentially have the effect of saying Sandrini's exposure to the plants wasn't enough to make it a public use? It could. I think that it's a closer question. I think that the whole issue, in fact, you asked a question about whether Sandrini agreed to keep it secret. There's certainly no factual finding in the record that Sandrini agreed to keep it secret. It wasn't among the associates of the Rubik's Cube guy to keep it secret either. It was just a question of whether his showing the cube like that was enough. Well, I think that in that case, the setting at least created the inference that there was an agreement to keep it secret. Okay. We have your argument. We thank Alcom for the case. Thank you.